**Donald CULLEN, Plaintiff,**

v.

**NETFLIX, INC., Defendant.**

**Case No. 5:11–cv–01199–EJD.**

United States District Court,
N.D. California,
San Jose Division.

July 13, 2012.

Compl. ¶¶ 59, 68, 85. Therefore, the court considers these arguments waived. *See Olson,* 2006 WL 503291, at *14.

Melanie Rae Persinger, Gregory Steven Weston, The Weston Firm, San Diego, CA, John Joseph Fitzgerald, IV, Santa Clara, CA, for Plaintiff.

Jacob Michael Harper, David Frank McDowell, Morrison & Foerster LLP, Los Angeles, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT WITH LEAVE TO AMEND

EDWARD J. DAVILA, District Judge.

Presently before the court is Defendant Netflix, Inc.'s ("Netflix") Motion to Dismiss the Second Amended Complaint ("SAC") filed by Plaintiff Donald Cullen ("Cullen"), on behalf of himself and all others similarly situated. *See* Docket No. 31. Having fully reviewed the moving and responding papers, and the oral arguments of counsel presented at the hearing on January 6, 2012, Netflix's motion is GRANTED with leave to amend for the reasons described below.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The allegations contained in this section are taken largely from the SAC. Being a deaf individual, Cullen, like millions of hearing-impaired Americans, relies on closed captioning (or subtitles) to view video programs.[1] SAC, Docket No. 26, ¶¶ 4–5, 9. To ensure access to closed captioning programs, Congress enacted laws requiring video programming distributors and providers to caption their video programming. *Id.* ¶ 5.

Netflix is a provider of both on-demand streaming video programming over the internet and flat-rate online DVD–Video and Blu-ray Disc rental-by-mail. *Id.* ¶ 6. Customers of Netflix pay a monthly subscription fee, which differs based on options

---

1. Closed captioning is a system which displays text on a television or video screen, typically a transcription of the audio portion of the program as it occurs sometimes including non-speech elements, to provide interpretive information to viewers who need it. *Id.* ¶ 4.

selected. *Id.* Netflix began providing streaming video programming in or about January 2008. *Id.* ¶ 16. Although Netflix has offered streaming video programming since 2008, currently, only a small portion of its library is subtitled. *Id.* ¶ 7. Cullen became a Netflix member in May 2009, initially subscribing to an "unlimited 3 DVD" plan because of the streaming library's lack of captioned content. *Id.* ¶¶ 33, 51.

In a June 12, 2009 blog entry posted on Netflix's website, Neil Hunt ("Hunt"), Netflix's Chief Product Officer, announced that "[c]aptioning is in our development plans," and that Netflix would "expect to deliver subtitles or captions ... and roll the same technology out to each CE device as we are able to migrate the technology...." *Id.* ¶ 17, Ex. A. Four months later, on October 5, 2009, Netflix's Director of Communications, Catherine Fisher, reiterated Hunt's statement in a public communication with the advocacy group, the National Association of the Deaf, stating that Netflix "developers continue to work on closed captioning." *Id.* ¶ 20, Ex. B. Over the next year, Netflix made similar statements, announcing in an April 15, 2010 blog entry that 100 titles had been captioned, that there was "much more to come," (*id.* ¶ 22, Ex. C), and in a November 22, 2010 "tweet" that Netflix "offers [closed captioning] on a growing [number] of titles," that could be accessed from a number of devices. *Id.* ¶ 25, Ex. D. On February 24, 2011, Hunt represented that there were "more than 3,500 TV episodes and movies" with subtitles in Netflix's streaming library "representing about 30% of viewing." *Id.* ¶ 27. Hunt also stated that "[m]ore subtitles are being added ev-

ery week, and [Netflix] expect[s] to get to 80% viewing coverage by the end of 2011." *Id.* ¶ 28, Ex. E.

Cullen alleges Netflix's statements "were designed to and did have the effect of conveying to Netflix's deaf and hard of hearing members that Netflix would meaningfully subtitle its streaming library within a reasonable period of time." *Id.* ¶ 31. Cullen and the class members relied on these statements in purchasing or maintaining monthly Netflix subscriptions. *Id.* ¶ 32. In addition, the SAC further alleges that Netflix's failure to caption imposed on Cullen and putative class members a veritable "deaf tax" because the DVD-by-mail plans that gave them sufficient access to video programming were sold at a significant premium (up to $11.99) to Netflix's streaming subscription. *Id.* ¶¶ 41–49.

On March 11, 2011, Cullen filed a class action lawsuit in this court. *See* Docket No. 1.[2] Cullen filed his SAC on September 9, 2011. Plaintiff brings discrimination based claims on behalf of himself and similarly situated consumers under California's Unruh Civil Rights Act, Cal. Civ. Code §§ 51, *et seq.,* ("Unruh Act") and California's Disabled Persons Act, Cal. Civ. Code §§ 54, *et seq.,* ("DPA") for Netflix's failure to provide full and equal access to its services. SAC ¶¶ 103–112. In addition, Plaintiff brings consumer protection based claims under California's Unfair Competition Law, Cal. Bus. & Prof.Code §§ 17200, *et seq.,* ("UCL"), False Advertising Law, Cal. Bus. & Prof.Code §§ 17500, *et seq.,* ("FAL"), and Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.,* ("CLRA") for Netflix's false promises, misrepresentations, and material omissions

---

**2.** Cullen's initial Complaint asserted a claim under the Americans with Disabilities Act. After being assured by the National Association of the Deaf and the Civil Rights Division of the Department of Justice that another plaintiff would pursue that claim in a sepa-

rate proceeding, *see generally Nat'l Ass'n of the Deaf v. Netflix, Inc.,* No. 11–30168–MAP (D.Mass. filed June 16, 2011), Cullen amended his complaint to drop that claim. *See* Opp'n Mot. To Dismiss SAC ("Opp'n"), Docket No. 32, at 4 n. 1.

concerning the amount of subtitled content, the rate at which Netflix was adding subtitled content, and the date by which a substantial portion of its streaming library would be subtitled. *Id.* ¶¶ 72–102.

On October 5, 2011, Netflix filed this motion to dismiss. *See* Docket No. 31. On November 4, 2011, Cullen filed written opposition to the motion. *See* Docket No. 32. On November 18, 2011, Netflix filed its reply brief. *See* Docket No. 33. On January 5, 2012, with leave of court, Cullen filed his sur-reply brief. *See* Docket No. 40. On January 6, 2012, oral argument on the motion to dismiss was heard. On March 23, 2012, Cullen and Netflix filed a joint status report regarding the impact of the FCC regulations governing closed captioning of streaming video programming. *See* Docket No. 47. On June 19, 2012, Cullen filed a statement of recent decision. *See* Docket No. 48. On July 9, 2012, Netflix filed a statement of recent decision as well. *See* Docket No. 49.

## II. LEGAL STANDARD

A complaint may be dismissed for failure to state a claim upon which relief may be granted if a plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Allegations of material fact must be taken as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996). However, the court need not accept as true allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001); *see also Twombly,* 550 U.S. at 561, 127 S.Ct. 1955 ("a wholly conclusory statement of [a] claim" will not survive a motion to dismiss).

On a motion to dismiss, the court's review is limited to the face of the complaint and matters judicially noticeable. *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986); *N. Star Int'l v. Ariz. Corp. Comm'n,* 720 F.2d 578, 581 (9th Cir. 1983). However, under the "incorporation by reference" doctrine, the court also may consider documents which are referenced extensively in the complaint and which are accepted by all parties as authentic. *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir.1999).

Finally, although their claims arise under state law, Plaintiffs' allegations are subject to the Federal Rules of Civil Procedure. *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1125 (9th Cir.2009) (quoting *Vess v. Ciba—Geigy Corp. USA,* 317 F.3d 1097, 1102 (9th Cir.2003)) ("[T]he Federal Rules of Civil Procedure apply in federal court, 'irrespective of the source of the subject matter jurisdiction, and irrespective of whether the substantive law at issue is state or federal.'"). Specifically, allegations sounding in fraud are subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b). *See Vess,* 317 F.3d at 1103–04 (if "the claim is said to be 'grounded in fraud' or to 'sound in fraud,' [then] the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)."); *Kaplan v. Rose,* 49 F.3d 1363, 1370 (9th Cir.1994) (claims based in fraud "must state precisely the time, place, and nature of the misleading statements, misrepresentations, and specific acts of fraud.").

## III. DISCUSSION

### A. Discrimination Based Claims

Netflix argues that Cullen's discrimination based claims must be dismissed because (1) the FCC has primary jurisdiction over the critical issues; (2) the Unruh Act and DPA are preempted by the 21st Cen-

tury Act; and (3) Cullen fails to plead facts sufficient to state a claim under the Unruh Act and the DPA. Because the court finds that Cullen's failure to state a claim is sufficient to dismiss these claims, it need not address Netflix's primary jurisdiction and preemption arguments at this time.

### 1. Violation of the Unruh Act and the DPA Based on the ADA

Netflix argues that Cullen's DPA claim and Unruh Act claim both fail because they rely on a violation of the Americans with Disabilities Act of 1990 ("ADA"), and Cullen cannot state a violation of the ADA because Netflix's streaming library is not a place of public accommodation. *See* Def. Netflix, Inc.'s Reply Supp. Mot. To Dismiss SAC at 9:3–4. Cullen argues that because Netflix's conduct of denying hearing-impaired individuals "full and equal access" to its streaming video library is a violation of the ADA, it is also a violation of the Unruh Act and the DPA. *See* Opp'n at 5:18–19.

A violation of the ADA is, by statutory definition, a violation of both the Unruh Act and the DPA. Cal. Civ. Code §§ 51(f), 54.1(d). Title III of the ADA prohibits discrimination in public accommodations. In order to prevail on a discrimination claim under Title III, a plaintiff must show that: "(1) he is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied a public accommodation by the defendant because of his disability." *Ariz. ex rel. Goddard v. Harkins Amusement Enters.*, 603 F.3d 666, 670 (9th Cir.2010). The Ninth Circuit has held that a "place of public accommodation" under the ADA, is limited to "an actual physical place."

*Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir.2000).

Other circuits which have suggested that a "place of public accommodation" has a more expansive meaning. *See, e.g., Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Assoc. of New England, Inc.*, 37 F.3d 12, 19–20 (1st Cir.1994) (holding that "public accommodations" are not limited to actual physical structures); *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir.1999) (noting, in dicta, that a "place of public accommodation" encompasses facilities open to the public in both physical and electronic space). Applying First Circuit law, a court in the District of Massachusetts recently held that the ADA applies to Netflix's streaming video library, which "falls within at least one, if not more, of the enumerated ADA categories." *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, No. 11–CV–30168–MAP, 869 F.Supp.2d 196, 200–01, 2012 WL 2343666, at *3 (D.Mass. June 19, 2012).

This court, however, must adhere to Ninth Circuit precedent. *See Ky Minh Pham v. Hickman*, 262 Fed.Appx. 35, 39 (9th Cir.2007) ("[I]n the absence of Supreme Court law, [a district court] is bound to follow Ninth Circuit precedent."). Applying *Weyer*, courts in this District have held that websites are not places of public accommodations under the ADA because they are not actual physical places. *See, e.g. Nat'l Fed'n of the Blind v. Target Corp.*, 452 F.Supp.2d 946, 952 (N.D.Cal. 2006) (holding that the ADA can only apply to a website when "there is a 'nexus' " alleged between the challenged conduct and defendant's "physical space.");[3] *Young v. Facebook, Inc.*, 790 F.Supp.2d 1110, 1115 (N.D.Cal.2011) (dismissing ADA claim against Facebook in part because

---

**3.** Cullen has not alleged a "nexus" between Netflix's streaming video website and an actu-

al physical space.

"Facebook operates only in cyberspace, and is thus is not a 'place of public accommodation' as construed by the Ninth Circuit."); *Earll v. eBay, Inc.*, No. 5:11–CV–00262–JF HRL, 2011 WL 3955485, at *2 (N.D.Cal. Sept. 7, 2011) (holding that eBay's website is not a place of public accommodation under the ADA).

■ Here, Netflix's streaming video library is a website where consumers can access videos with an internet connection. SAC ¶ 16. The Netflix website is not "an actual physical place" and therefore, under Ninth Circuit law, is not a place of public accommodation. *See Weyer*, 198 F.3d at 1114. Because the website is not a place of public accommodation, the ADA does not apply to access to Netflix's streaming library. Thus, Cullen's claim that Netflix failed to provide full and equal access under the DPA and the Unruh Act cannot rest on Netflix's alleged failure to comply with the ADA.

This conclusion, however, does not necessarily render Cullen's DPA and Unruh Act claims meritless. Cullen may be able to pursue his discrimination claims if they are asserted as independent claims separate from an ADA violation because both the Unruh Act and the DPA apply to websites "as a kind of business establishment and an accommodation, advantage, facility, and privilege of a place of public accommodation, respectively. No nexus to [a] physical [place] need be shown." *Nat'l Fed'n of the Blind v. Target Corp.*, 582 F.Supp.2d 1185, 1196 (N.D.Cal.2007).

### 2. Independent Violation of the Unruh Act

The Unruh Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their ... disability ... are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b).

■ A violation of the Unruh Act may be maintained independent of an ADA claim only where a plaintiff pleads "intentional discrimination in public accommodations in violation of the terms of the Act." *Munson v. Del Taco, Inc.*, 46 Cal.4th 661, 668, 94 Cal.Rptr.3d 685, 208 P.3d 623 (2009) (quoting *Harris v. Capital Growth Investors XIV*, 52 Cal.3d 1142, 1175, 278 Cal.Rptr. 614, 805 P.2d 873 (1991)). To prove intentional discrimination there must be allegations of "willful, affirmative misconduct," and the plaintiff must allege more than the disparate impact of a facially neutral policy on a particular group. *Koebke v. Bernardo Heights Country Club*, 36 Cal.4th 824, 854, 31 Cal.Rptr.3d 565, 115 P.3d 1212 (2005); *Young*, 790 F.Supp.2d at 1116.

■ Thus, to sufficiently state a cause of action under the Unruh Act, Cullen's claim cannot be based solely on the disparate impact of Netflix's policies on hearing-impaired individuals but must be grounded in allegations of intentional discrimination. *See id.* Here, Cullen alleges that Netflix did not caption a meaningful amount of its streaming library at the rate consumers expected (SAC ¶ 53), and its streaming library is not accessible to hearing-impaired individuals because only a small portion of it is subtitled (*id.* ¶¶ 7, 105). These allegations describe a policy with a disparate impact on hearing-impaired individuals, but do not describe willful, affirmative misconduct. Furthermore, the SAC also includes allegations demonstrating Netflix's efforts to improve access for hearing-impaired customers that offset an inference of intentional discrimination. For example, the rate at which Netflix is captioning content has continued to increase since 2008. *See id.* ¶¶ 36–39 (listing average number of captioned titles added

per day since 2008 (0.64), since 2009 (1.16), since 2010(2), and the current rate (2.33)). Thus, Cullen has not pleaded intentional discrimination. *See Koebke,* 36 Cal.4th at 854, 31 Cal.Rptr.3d 565, 115 P.3d 1212. Because the SAC does not adequately plead an intentional discrimination claim under the Unruh Act, Netflix's motion to dismiss Cullen's Unruh Act claim is GRANTED with leave to amend.

### 3. Independent Violation of the Disabled Persons Act

■ The DPA provides that "[i]ndividuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities, ... places of public accommodation, amusement, or resort, and other places to which the general public is invited...." Cal. Civ. Code § 54.1(a)(1). " 'Full and equal access' is defined by section 54.1 to mean access that complies with the regulations developed under the federal ADA or under state statutes, if the latter imposes a higher standard." Cal. Civ. Code § 54.1(a)(3); *Urhausen v. Longs Drug Stores Cal., Inc.,* 155 Cal.App.4th 254, 263, 65 Cal.Rptr.3d 838 (Cal.App. 2007). Thus, "[a]n independent DPA claim requires a showing that accessibility regulations promulgated under California law exceed those set by the ADA." *Earll,* 2011 WL 3955485, at *3 (citing Cal. Civ. Code § 54.1(a)(3) and *Urhausen,* 155 Cal. App.4th at 263, 65 Cal.Rptr.3d 838).

Cullen, however, has not pointed to any relevant standards established by California law that exceed those set by the ADA. Thus, Cullen has failed to plead facts sufficient to allege that Netflix has failed to provide full and equal access as defined by the DPA. Netflix's motion to dismiss Cullen's DPA claim therefore is GRANTED with leave to amend.

### B. Consumer Protection Based Claims

#### 1. UCL, FAL, and CLRA Claims Based on Misrepresentation

Cullen also alleges Netflix violated the UCL, FAL, and CLRA through its omissions and misrepresentations about the streaming video library's closed captioning, which had the "effect of conveying to Netflix's deaf and hard of hearing members that Netflix would meaningfully subtitle its streaming library within a reasonable period of time." SAC ¶ 31; *see also* ¶¶ 79, 89, 93, 98 (alleging misrepresentations and omissions violated the "fraudulent" prong of the UCL, the FAL, and the CLRA). Netflix argues that Cullen has failed to allege facts showing Netflix's representations were false or misleading according to the reasonable consumer standard.

■ The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof.Code § 17200. The FAL makes it unlawful for a business to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.* at § 17500. Any violation of the FAL constitutes a violation of the UCL. *Williams v. Gerber Products Co.,* 552 F.3d 934, 938 (9th Cir.2008). The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code § 1770. Rule 9(b)'s heightened pleading standards apply to all UCL, FAL, or CLRA claims that are grounded in fraud. *See Vess,* 317 F.3d at 1103–06. Under Rule 9(b), "[a]verments of fraud must be accompanied by the 'who, what, when, where and how' of the misconduct charged." *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir.2009) (quoting *Vess,* 317 F.3d at 1106).

■■ These laws prohibit not only advertising which is false, but also advertis-

ing which, although true, is either misleading or which has a capacity, likelihood or tendency to deceive or confuse the public. *Williams,* 552 F.3d at 938. UCL, FAL, and CLRA claims grounded in fraud are governed by the "reasonable consumer" test. *Id.* Under the reasonable consumer standard, the plaintiff must "show that members of the public are likely to be deceived." *Id.* (internal citations omitted).

California courts "have recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision on [a motion to dismiss]." *Id.* However, courts have occasionally dismissed complaints as a matter of law because they did not meet the "reasonable consumer" standard. *See Freeman v. Time, Inc.,* 68 F.3d 285, 289 (9th Cir.1995) (affirming dismissal of UCL, FAL, and CLRA claims because statements promising sweepstakes payout in exchange for purchasing magazine subscription unlikely to deceive "person of ordinary intelligence.").

### a. Representation that Netflix Had Meaningfully Captioned Content

Cullen alleges that Netflix's statements made between June 12, 2009 and February 24, 2011, which are discussed individually below, combined together had the effect of conveying to Netflix's deaf and hard of hearing members that Netflix would "meaningfully" subtitle its streaming library within a "reasonable" period of time, and that it would provide related technology in a variety of hardware platforms. SAC ¶ 32. Cullen further alleges that Netflix's streaming video library is effectively useless due to the small amount of captioned content, lack of support tools, and slow captioning rate. *Id.* ¶ 33. Netflix argues that Cullen never alleges Netflix represented it had "meaningfully" captioned its content and that, even if Netflix had made that representation, a vague statement to provide meaningful captioning does not express an objectively verifiable fact actionable under the UCL, FAL, or CLRA.

"Generalized, vague, and unspecified assertions constitute 'mere puffery' upon which a reasonable consumer could not rely, and hence are not actionable." *Oestreicher v. Alienware Corp.,* 544 F.Supp.2d 964, 973 (N.D.Cal.2008) (internal quotation marks and citations omitted), aff'd by 322 Fed.Appx. 489 (9th Cir. 2009). Vague or highly subjective claims about product superiority amount to nonactionable puffery; only "misdescriptions of specific or absolute characteristics of a product are actionable." *Id.* (quoting *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1145 (9th Cir.1997)).

Here, Cullen rests his claims on Netflix's representations that implied Netflix had "meaningfully" captioned its content. A representation that the captioned content is at meaningful level is a vague and subjective claim and therefore is not actionable under the UCL, FAL, or CLRA. *See, e.g., id.; Edmunson v. Procter & Gamble Co.,* No. 10–CV–2256–IEG (NLS), 2011 WL 1897625, at *3, 2011 U.S. Dist. LEXIS 53221, at *10–12 (S.D.Cal. May 17, 2011) (dismissing UCL and CLRA claims; statement that product is "superior" is "subjective representation," not an objectively verifiable fact); *Baltazar v. Apple, Inc.,* No. CV–10–3231–JF, 2011 WL 3795013, at *4–6 (N.D.Cal. Aug. 26, 2011) (dismissing UCL, FAL, and CLRA claims; statement that the iPad can be used "just like a book" is mere puffery). Thus, the court proceeds by individually evaluating the allegedly deceptive statements upon which Cullen bases his UCL, FAL, and CLRA claims.

### b. Allegations Regarding Deceptive Statements

 Cullen first argues that Hunt's June 12, 2009 blog entry that Netflix would "expect to deliver subtitles or captions to Silverlight clients sometime in 2010, and roll the same technology out to each CE device as [Netflix is] able to migrate the technology" is deceptive because it falsely attributed Netflix's failure to caption content sooner on technical difficulties. SAC ¶¶ 17–18. The SAC, however, does not plead facts in support of the conclusory allegation that this attribution is false. The SAC alleges that other streaming video content providers were captioning content with existing technology, which Netflix also could have used. *Id.* ¶ 18. But the fact that another, better technology existed does not contradict the representation that Netflix's captioning rate was limited by technical difficulties, much less state a plausible claim that Netflix's statement was false or misleading. Therefore, the SAC fails to allege any facts showing that Hunt's June 12, 2009 blog entry is likely to deceive members of the public.

 Cullen also argues that Netflix's statements between October 5, 2009 and November 22, 2010 were misrepresentations. Specifically, Netflix said it would "continue to work on closed captioning," that there was "much more to come," similar technology would soon be released for Netflix's other platforms, and closed captioning was offered on a growing number of titles. *Id.* ¶¶ 20–25. Cullen fails to allege facts in support of his allegation that these statements were false and misleading. Rather, the SAC pleads facts indicating that these statements were true. According to the SAC, the rate at which Netflix has added captioned titles to its streaming library has continued to increase since 2008. *See id.* ¶¶ 36–39. These alleged facts are consistent with Netflix's representations that it is working on closed captioning and more titles with closed captioning would be added to the library. Thus, the SAC fails to allege facts sufficient to state a plausible claim that Netflix's statements between October 5, 2009 and November 22, 2010 are likely to deceive members of the public.

 Additionally, Cullen bases his UCL, FAL, and CLRA claims on statements Hunt made in a February 24, 2011 blog entry. In this blog entry, Hunt stated that there are "more than 3,500 TV episodes and movies" with subtitles in Netflix's streaming library "representing about 30% of *viewing.* More subtitles are being added every week and we expect[4] to get to 80% *viewing coverage* by the end of 2011." *Id.* ¶ 27–28; Ex. E (emphasis added). The SAC alleges that "only about 6% of Netflix's streaming video programming was captioned" and "Netflix's promise to caption 80% of its library by the end of 2011 is not reflected in its behavior." *Id.* ¶ 35, 40. These allegations about the percentage of captioned programming, a number based on the total number of titles in the library, do not contradict Netflix's claim that the captioned titles represent 30% of viewing, a usage-based number, or

---

4. Netflix argues that the statement about Hunt's expectation of reaching 80% viewing coverage is an opinion about future events and not an actionable representation on which a consumer would reasonably rely. In support of this argument, Netflix cites to *Neu–Visions Sports v. Soren/McAdam/Bartells,* 86 Cal.App.4th 303, 309–310, 103 Cal.Rptr.2d 159 (2000), in which the court held that,

under a theory of negligent misrepresentation, an "actionable misrepresentation must be made about past or existing facts; statements regarding future events are merely deemed opinions." Netflix has not cited, and this court has not found, any cases holding that statements about future facts are not actionable under the UCL, FAL, or the CLRA.

that Netflix expected to reach 80% viewing coverage by the end of 2011.

In opposition to the motion to dismiss, Cullen argued that regardless of what Hunt meant when he made the statement, a reasonable consumer would understand Hunt's representation that 30% of viewing is captioned to mean that 30% of titles are captioned and would understand 80% viewing coverage to mean 80% of the titles in Netflix's library. *See* Tr. at 25–26, 29, Docket No. 42; Opp'n at 24: 12–19. The SAC, however, does not contain these allegations or any other allegations about the misleading nature of this usage-based measurement and therefore fails to allege facts sufficient to state a plausible claim that Hunt's February 24, 2011 blog entry is likely to deceive members of the public.

For the reasons above, Netflix's motion to dismiss Cullen's claims under the fraudulent prong of the UCL, the FAL, and the CLRA is GRANTED with leave to amend.

### 2. UCL Claims Based on Unlawful Prong

Cullen's "unlawful" claims under the UCL rely on his other causes of actions. Because Cullen's other claims fail, his UCL claims premised on "unlawful" acts has no basis and must also fail. *See Ingels v. Westwood One Broad. Servs., Inc.*, 129 Cal.App.4th 1050, 28 Cal.Rptr.3d 933, 938 (2005) ("If the [underlying] claim is dismissed, then there is no 'unlawful' act upon which to base the derivative [UCL] claim."); *Pantoja v. Countrywide Home Loans, Inc.*, 640 F.Supp.2d 1177, 1190–1191 (N.D.Cal.2009) (dismissing UCL claim because court dismissed "all … predicate violations"). Thus, Netflix's motion to dismiss Cullen's claims under the unlawful prong of the UCL is GRANTED with leave to amend.

### 3. UCL Claims Based on the Unfair Prong

An unfair business practice under the UCL is "one that either offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir.2008) (omitting internal citations). To test whether a business practice is unfair, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim. *Bardin v. Daimlerchrysler Corp.*, 136 Cal.App.4th 1255, 1268, 39 Cal.Rptr.3d 634 (2006) (omitting internal citations).

Cullen's claims under the unfair prong of the UCL rely partly on allegations about Netflix's deceptive statements and statutory violations. As discussed above, the SAC does not allege facts sufficient to state a plausible claim that Netflix's conduct was misleading or otherwise unlawful, thus Netflix's unfair prong claims are insufficient in that respect.

Additionally, Cullen claims Netflix's failure to caption imposed on hearing-impaired individuals a veritable "deaf tax" because the DVD-by-mail plans that provide sufficient access to video programming were sold at a significant premium to Netflix's streaming subscription. *See* SAC ¶¶ 41–49. Cullen alleges this practice is "immoral, unscrupulous, and offends public policy … [and] the gravity of Netflix'[s] conduct outweighs any conceivable benefit of such conduct." *Id.* ¶ 74. According to the SAC, Cullen must purchase Netflix's "unlimited 2 DVD" plan to meet his viewing needs. *Id.* ¶ 46. On November 22, 2010, the difference between the "unlimited 2 DVD" plan and the streaming-only plan was $7 per month. *Id.* ¶ 41. On July 12, 2011, Netflix changed its plans and provided customers the option of plans with (1) streaming only; (2) DVDs only;

(3) or DVDs and streaming. *Id.* ¶ 47. At the time the SAC was filed, Cullen subscribed to Netflix's "unlimited 2 DVD" and unlimited streaming plan; the difference between this plan and the streaming-only plan was $11.99. *Id.* ¶¶ 47, 49. Cullen has not alleged facts about any potential utility of charging a higher subscription fee for the more accessible DVD-by-mail plan than for the streaming-only plan price. Thus, Cullen has not stated a plausible claim that the gravity of the harm outweighs the utility of the conduct and thus that the price difference is immoral or unscrupulous. Netflix's motion to dismiss Cullen's claims under the unfair prong of the UCL therefore is GRANTED with leave to amend.

## IV. ORDER

Based on the foregoing, Netflix's Motion to Dismiss is GRANTED WITH LEAVE TO AMEND. Any amended complaint shall be filed no later than 30 days from the date this order is filed.

**IT IS SO ORDERED.**